**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-1043
_____

JERRY REEVES,

Appellant

v.

FAYETTE SCI; THE ATTORNEY GENERAL OF THE
STATE OF PENNSYLVANIA; THE DISTRICT
ATTORNEY OF DAUPHIN COUNTY

_____

APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA
(D.C. No. 3-14-cv-01500)
District Judge: Hon. Malachy E. Mannion

_____

Argued May 16, 2018
_____

Before: MCKEE, SHWARTZ, and COWEN, <u>Circuit Judge</u>.

(Filed: July 23, 2018)

Matthew Stiegler, Esq. [ARGUED]
Law Office of Matthew Stiegler
7145 Germantown Avenue, Suite 2
Philadelphia, PA 19119

David R. Fine, Esq.
K&L Gates LLP
17 North Second Street, 18th Floor
Harrisburg, PA 17101

   *Counsel for Appellant*

Francis T. Chardo, Esq.
Ryan H. Lysaght, Esq. [ARGUED]
Dauphin County Office of the District Attorney
101 Market Street, 2nd Floor
Harrisburg, PA 17101

   *Counsel for Appellee*

Stephen Fogdall, Esq.
Schnader Harrison Segal & Lewis LLP
1600 Market Street
Suite 3600
Philadelphia, PA 19103

   *Counsel for Amicus Curiae Former*
   *Prosecutors, Members of the Judiciary, and*
   *Law Enforcement Officers*

Ronald F. Wick, Esq.
Erica C. Lai, Esq.
Danielle Morello, Esq.
Melissa H. Maxman, Esq.
Cohen & Gresser LLP
2001 Pennsylvania Avenue NW, Suite 300
Washington, DC 20001

       *Counsel for Amicus Curiae the Innocence*
       *Network and the Pennsylvania Innocence*
       *Project*


David Rudovsky, Esq.
Jonathan H. Feinberg, Esq.
Jules Epstein, Esq.
Kairys, Rudovsky, Messing, Feinberg & Lin LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106

       *Counsel for Amicus Curiae Scholars of Habeas*
       *Corpus Law*

_____

OPINION OF THE COURT
_____

SHWARTZ, <u>Circuit Judge</u>.

Jerry Reeves was convicted of robbery, carrying a firearm without a license, and second degree murder relating

to an armed robbery of a gas station convenience store that resulted in the death of the store clerk. Reeves was sentenced to life imprisonment without the possibility of parole. He filed a four-months-late habeas petition in federal court asserting ineffective assistance of counsel and seeking to excuse his petition's untimeliness based on the actual innocence exception to procedural default recognized in Schlup v. Delo, 513 U.S. 298 (1995), and extended to include time-barred petitions in McQuiggin v. Perkins, 569 U.S. 383 (2013). To qualify for this exception, the petitioner must present new, reliable evidence showing it is more likely than not that no reasonable juror would have voted to convict him. Schlup, 513 U.S. at 324, 329. Because we conclude that Reeves has identified evidence that may show actual innocence that was not presented to the jury, we will vacate and remand for further proceedings.

I

On May 25, 2006, a man robbed a City Gas and Diesel convenience store in Harrisburg, Pennsylvania and shot and killed the store's clerk. The robbery and shooting were captured on the store's silent, black-and-white surveillance video. The video shows that a single robber entered the store and pointed a gun at the clerk. The clerk tried to close a bulletproof glass window, but the robber's arm blocked the window from closing. The robber fired a shot, causing the clerk to fall back. The clerk got up, made a surrendering gesture, and began emptying the cash register. The clerk then fell to the floor, and the robber jumped over the counter through the open bulletproof glass window and collected the remaining money. He then left the store on foot. A local newspaper published a story about the crime the next day.

4

A few days after the shooting, Reeves, then eighteen years old, was in jail for conduct unrelated to the robbery. A police officer asked him about the convenience store robbery and Reeves claimed that he had witnessed the crime and identified a robber by name. Reeves was subsequently released and attended his family's Memorial Day cookout a few days later. On May 30, 2006, the police interviewed Reeves, who ultimately admitted that he had lied about witnessing the robbery to gain release and attend his family's cookout. He was charged with and pleaded guilty to hindering apprehension.

Around this time, the police had received information about other potential suspects. The same day the robbery occurred, the police were notified that two individuals who had previously been convicted of other crimes—Kai Anderson and Michael Holmes—failed to show up at a work-release center located near the City Gas and Diesel and that Anderson fit the physical description of the robber. On May 29, 2006, the police spoke to Danielle Ignazzito—the mother of Anderson's child—who stated that Anderson called her two days after the robbery, telling her he had "a lot of money" to give her for outstanding child support. App. 155. She further stated that she received a call from Kenneth Marlow, who told her that Anderson and Holmes had fled the state because police were looking for Anderson for the robbery. On May 31, 2006, Anderson was arrested and admitted escaping the work release center with Holmes, talking to Marlow, and asking Marlow to call Ignazzito. Anderson claimed that a different person committed the robbery.

On June 9, 2006, the police interviewed Marlow. Marlow stated that Anderson told him that he was involved in

5

the robbery and asked Marlow to call Ignazzito for him. A few weeks later, Johnathan Johnston—who had been incarcerated with Anderson—told the police that Anderson confessed to him that he participated in the robbery with Holmes and Holmes's younger brother to obtain money to repay a victim of another robbery Anderson committed. According to Johnston, Anderson provided specific details about the robbery, including that the robber was not supposed to shoot the clerk but that the gun went off, and the clerk fell, got up, then fell again, at which point the robber jumped over the counter to retrieve the money. Johnston also stated that Anderson wanted Johnston's wife to threaten Ignazzito so that she would not talk to the police. Johnston further told the police that Anderson said he had also confessed to Marlow and that Marlow was not supposed to tell Ignazzito about the robbery. On March 9, 2007, the police interviewed Michael Holmes, who admitted to leaving the work release center with Anderson on the day of the robbery but spent the day visiting various people's homes. The record does not indicate why the Anderson leads were not pursued further, but before trial, Reeves's trial counsel was provided with copies of the police reports about Anderson and Holmes.

On July 29, 2009, more than three years after the shooting, Reeves and his then-girlfriend, who was pregnant, were arrested and taken to jail for conduct unrelated to the City Gas and Diesel robbery. Reeves again spoke to police officers and, ten to twelve hours later, confessed to committing the City Gas and Diesel robbery.

At Reeves's trial in 2010, the prosecutor presented the testimony of the officers who had interviewed Reeves, an audio recording of Reeves's confession, and the store

6

surveillance tape of the robbery and shooting, among other evidence. Reeves testified and denied involvement in the robbery, stating that he was experiencing health problems on the day of his July 29, 2009 confession and that detectives told him they would take him to the hospital only if he confessed. He also asserted that detectives promised to release his girlfriend if he confessed and that the police fed him details about the robbery for his taped confession. Reeves further stated that he was in Baltimore at the time of the crime, which caused the prosecution to call a rebuttal witness who testified that while he was in jail with Reeves, Reeves discussed paying a person to say that Reeves was in Baltimore, not Harrisburg, when the robbery occurred. The Kai Anderson evidence was not presented at trial.

The jury convicted Reeves of robbery, carrying a firearm without a license, and second degree murder. He was sentenced to life imprisonment. The Pennsylvania Superior Court affirmed the conviction and sentence on July 1, 2011, and Reeves did not appeal to the Pennsylvania Supreme Court.

On July 30, 2012, Reeves filed a Post-Conviction Relief Act ("PCRA") petition asserting ineffective assistance of counsel based on his trial counsel's failure to present the Kai Anderson evidence, among other alleged deficiencies. On October 10, 2012, the PCRA Court issued a memorandum order notifying Reeves of its intent to dismiss the PCRA petition. Reeves filed objections on October 29, 2012, and the PCRA Court dismissed the petition on November 26, 2012 without a hearing, concluding that trial counsel's failure to present evidence of an alternate suspect did not prejudice Reeves because Reeves confessed to committing the robbery

7

and the store surveillance video corroborated his confession.[1] On November 7, 2013, the Pennsylvania Superior Court summarily affirmed and adopted the PCRA Court's October 10, 2012 and November 26, 2012 opinions without additional reasoning. The Pennsylvania Supreme Court denied Reeves's petition for review.

On July 31, 2014, Reeves filed a federal habeas petition with new counsel, asserting ineffective assistance of counsel on the grounds that Reeves's trial counsel failed to investigate and present certain exculpatory evidence at trial, including evidence suggesting that Anderson and Holmes committed the robbery.[2] Reeves conceded that his federal habeas petition was filed approximately four months late, but asserted that this

---

[1] In its discussion concerning the Kai Anderson evidence, the PCRA Court stated: "Accepting Petitioner's argument that all of the hearsay and non-hearsay testimony that would have been presented at trial would have been admissible, Petitioner fails to explain how this testimony would have rebutted Petitioner's own admission to the robbery/homicide." App. 492.

[2] Besides the evidence concerning other alternative suspects, Reeves pointed to trial counsel's failures to adequately develop and/or present (1) evidence of Reeves's left-handedness and the shooter's right-handedness, (2) inconsistencies between Reeves's confession and the surveillance video, (3) a news article of the robbery which would show that Reeves's confession contained public information about the crime, (4) medical records showing Reeves was hospitalized on the day of his confession for a suicide attempt and had a history of mental health problems, and (5) evidence of Reeves's history of uncontrolled lying.

8

procedural defect was excusable because he had shown actual innocence. The petition was referred to the Magistrate Judge for a report and recommendation. The Magistrate Judge opined that the actual innocence exception requires the petitioner to present new evidence and that the evidence Reeves claims should have been presented was available to him and his trial counsel and thus did not qualify as new evidence. As a result, the Magistrate Judge denied an evidentiary hearing and recommended that the District Court dismiss Reeves's petition as untimely. The District Court adopted the Magistrate Judge's report and recommendation, agreed that the evidence concerning alternative suspects was not new evidence because it was available at trial, concluded that Reeves failed to demonstrate actual innocence sufficient to overcome the statute of limitations, and dismissed Reeves's petition as time-barred. The District Court also denied an evidentiary hearing and a certificate of appealability. Reeves sought a certificate of appealability, which we granted as to, among other things, "(1) whether the evidence Appellant relied on in the District Court constitutes 'new' evidence" and "(2) whether Appellant's evidence satisfied the [actual innocence] standard." App. 72-73.

II[3]

_____

[3] The District Court had jurisdiction under 28 U.S.C. § 2254. Our Court has jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253. Our review is plenary where, as here, the District Court did not conduct an evidentiary hearing. Houck

Reeves asserts that his trial counsel was ineffective for failing to present at trial evidence of alternative suspects for the shooting, his left-handedness, mental condition at the time of his confession, and history of compulsive lying. He concedes that his petition is late but argues that this exculpatory evidence demonstrates actual innocence and warrants excusing his untimeliness.

A

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), state prisoners have one year to file a federal habeas petition, which begins to run from "the date on which the judgment became final." 28 U.S.C. § 2244(d)(1)(A). However, to prevent a "fundamental miscarriage of justice," an untimely petition is not barred when a petitioner makes a "credible showing of actual innocence," which provides a gateway to federal review of the petitioner's otherwise procedurally barred claim of a constitutional violation.[4] McQuiggin, 569 U.S. at 386, 392. This

_____

v. Stickman, 625 F.3d 88, 93 (3d Cir. 2010). In addition, we exercise plenary review over the District Court's determination of a petitioner's claim of actual innocence. Sweger v. Chesney, 294 F.3d 506, 522 (3d Cir. 2002).

[4] In contrast to gateway (or procedural) actual innocence claims, freestanding (or substantive) claims of actual innocence assert innocence without any accompanying constitutional defect in the trial resulting in the conviction. See Schlup, 513 U.S. at 313-16 (distinguishing between the two types of claims). The Supreme Court has not definitively resolved whether such freestanding actual innocence claims

"exception[] is grounded in the 'equitable discretion' of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons," and it "survived AEDPA's passage."[5]  Id. at 392-93.  In this context, actual innocence refers to factual innocence, not legal insufficiency.

---

are cognizable, McQuiggin, 569 U.S. at 392, but to the extent they are, they are assessed under a more demanding standard, since the petitioner's claim is that his conviction is constitutionally impermissible "even if his conviction was the product of a fair trial," Schlup, 513 U.S. at 316.  See House v. Bell, 547 U.S. 518, 555 (2006) (concluding that the petition satisfied the gateway innocence standard announced in Schlup but not the higher standard for freestanding innocence discussed in Herrera v. Collins, 506 U.S. 390, 417 (1993)). Gateway innocence claims, on the other hand, assert a claim of actual innocence "so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error."  Schlup, 513 U.S. at 316.

[5]  Although AEDPA explicitly provides actual innocence exceptions to some of its procedural provisions, and these exceptions incorporate a newly discovered evidence standard, see 28 U.S.C. §§ 2244(b)(2)(B) and 2254(e)(2), the Supreme Court has explained that the actual innocence miscarriage of justice exception is separate from AEDPA's statutory provisions, and the exception survived AEDPA's passage.  McQuiggin, 569 U.S. at 393-98.  Thus, AEDPA's actual innocence provisions are not dispositive of the scope of new evidence under the actual innocence miscarriage of justice exception recognized by the Supreme Court in Schlup, House, and McQuiggin.

Sistrunk v. Rozum, 674 F.3d 181, 191 (3d Cir. 2012) (citation omitted).

To satisfy this standard, first, "a petitioner must present new, reliable evidence" and second, "show by a preponderance of the evidence 'that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence,'" Houck v. Stickman, 625 F.3d 88, 93 (3d Cir. 2010) (citing and quoting Schlup, 513 U.S. at 324, 327), or stated differently, that it is "more likely than not any reasonable juror would have reasonable doubt," House v. Bell, 547 U.S. 518, 538 (2006). As part of the reliability assessment of the first step, the court "may consider how the timing of [the petitioner's] submission and the likely credibility of the [witnesses] bear on the probable reliability of that evidence," as well as the circumstances surrounding the evidence and any supporting corroboration. Id. at 537, 551 (internal quotation marks and citation omitted); see also McQuiggin, 569 U.S. at 399.

In evaluating the second step—whether it is more likely than not no reasonable juror would convict the petitioner—the court "must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." House, 547 U.S. at 538 (internal quotation marks and citation omitted). "[M]ere impeachment evidence is generally not sufficient to satisfy the [actual innocence gateway] standard." Munchinski v. Wilson, 694 F.3d 308, 338 (3d Cir. 2012). However, new, reliable evidence that "undermine[s] the [trial] evidence pointing to the identity of the [perpetrator] and the motive for the [crime]" can suffice to show actual innocence. Goldblum v. Klem, 510 F.3d 204,

12

233 (3d Cir. 2007); see also Munchinski, 694 F.3d at 336-37 (explaining that actual innocence was demonstrated where new evidence both showed that the crime could not have happened in the way the Commonwealth presented at trial and provided an alternative theory that was more appropriate and better fit the facts of the case). In weighing the evidence, "[t]he court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors"; the actual innocence standard "does not require absolute certainty about the petitioner's guilt or innocence." House, 547 U.S. at 538.

The gateway actual innocence standard is "demanding" and satisfied only in the "rare" and "extraordinary" case where "a petition presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." McQuiggin, 569 U.S. at 386, 392, 401 (internal quotation marks and citations omitted).

B

The threshold requirement for applying the actual innocence standard is new evidence supporting the petitioner's innocence. The Supreme Court opinions addressing the actual innocence gateway do not explicitly define "new evidence," and our sister circuit courts are split on whether the evidence must be newly discovered or whether it is sufficient that the evidence was not presented to the fact-finder at trial. The Court of Appeals for the Eighth Circuit—the first to address the issue—held that "evidence is new only if it was not available at trial and could not have been discovered earlier through the exercise of due diligence." Amrine v. Bowersox, 238 F.3d

13

1023, 1028 (8th Cir. 2001) (internal citation and quotation marks omitted). Thereafter, the Courts of Appeals for the Seventh and Ninth Circuits concluded otherwise: petitioners can satisfy the actual innocence standard's new evidence requirement by offering "newly presented" exculpatory evidence, meaning evidence not presented to the jury at trial. See Gomez v. Jaimet, 350 F.3d 673, 679-80 (7th Cir. 2003); Griffin v. Johnson, 350 F.3d 956, 963 (9th Cir. 2003). More recently, the Courts of Appeals for the First, Second, and Sixth Circuits have similarly suggested that actual innocence can be shown by relying on newly presented—not just newly discovered—evidence of innocence. See Riva v. Ficco, 803 F.3d 77, 84 (1st Cir. 2015); Cleveland v. Bradshaw, 693 F.3d 626, 633 (6th Cir. 2012); Rivas v. Fisher, 687 F.3d 514, 543, 546-47 (2d Cir. 2012). The Court of Appeals for the Fifth Circuit has acknowledged but not weighed in on the circuit split.[6] Fratta v. Davis, 889 F.3d 225, 232 (5th Cir. 2018); see also Rozzelle v. Sec'y, Fla Dep't of Corr., 672 F.3d 1000, 1018

---

[6] Recent Fifth Circuit decisions, however, have included language arguably suggesting an inclination toward a newly discovered standard. See Fratta, 889 F.3d at 232 n.21 (citing Moore v. Quarterman, 534 F.3d 454, 465 (5th Cir. 2008), with a parenthetical stating that "evidence was not 'new' where 'it was always within the reach of [petitioner's] personal knowledge or reasonable investigation"); Floyd v. Vannoy, __ F.3d __, No. 17-30421, 2018 WL 3115935, at *7-9 (5th Cir. June 25, 2018) (using the phrase "newly-discovered evidence" in discussing fingerprint comparison evidence that existed at the time of trial but was neither known to the petitioner nor presented at trial, and holding that the evidence met the Schlup standard).

14

n.21 (11ᵗʰ Cir. 2012) (refraining from reaching issue of whether petitioner's evidence that was available at trial but was not presented should be considered "new" for purposes of Schlup).

Those courts that define "new evidence" to include evidence not presented at trial find support in Schlup. In announcing the standard for a gateway actual innocence claim, the Schlup Court stated that a federal habeas court, after being presented with new, reliable exculpatory evidence, must then weigh "all of the evidence, including . . . evidence tenably claimed to have been wrongly excluded or to have become available only after the trial" to determine whether no reasonable juror would have found the petitioner guilty. 513 U.S. at 327-28. The reference to "wrongly excluded" evidence suggests that the assessment of an actual innocence claim is not intended to be strictly limited to newly discovered evidence—at least not in the context of reaching an ineffective assistance of counsel claim based on counsel's failure to investigate or present at trial such exculpatory evidence, as was the case in Schlup. In addition, in articulating the new, reliable evidence requirement, the Supreme Court stated that the petitioner must "support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial."[7]   Id. at 324. Moreover, the Court used the phrase "newly presented evidence" in the context of discussing witness credibility assessments that may occur as part of the actual innocence gateway analysis. Id. at 330. When considered in the context

---

[7] Post-Schlup, the Supreme Court clarified that credible, actual innocence evidence was not limited to these three types of evidence. House, 547 U.S. at 537.

of the Court's other statement about weighing all evidence—including not only evidence unavailable at trial but also evidence excluded at trial—these references to evidence not presented at trial further suggest that new evidence, solely where counsel was ineffective for failing to discover or use such evidence, requires only that the evidence not be presented to the factfinder at trial. Indeed, among the new evidence presented by the petitioner in <u>Schlup</u> was an affidavit containing witness statements that were available at trial, <u>see</u> <u>id.</u> at 310 n.21, but the Supreme Court did not discuss the significance of the evidence's availability nor reject the evidence outright, which presumably it would have done if the actual innocence gateway was strictly limited to newly discovered evidence. <u>Schlup</u> therefore strongly suggests that new evidence in the actual innocence context refers to newly presented exculpatory evidence.[8] Indeed, in a subsequent

---

[8] The <u>Schlup</u> opinion discussed above was written by Justice Stevens and joined by Justices O'Connor, Souter, Ginsburg, and Breyer, while the four remaining justices dissented. Justice O'Connor, in addition to joining Justice Stevens's decision, also separately concurred, stating that she understood the majority to hold that a petitioner "'must show that it is more likely than not that no reasonable juror would have convicted him' in light of newly discovered evidence of innocence." 513 U.S. at 332 (citation omitted). She then proceeded to state that the majority did not "decide whether the fundamental miscarriage of justice exception is a discretionary remedy." <u>Id.</u> at 333. Had Justice O'Connor merely joined part of the majority opinion, her use of "newly discovered evidence" would have constituted <u>Schlup</u>'s holding. <u>See</u> <u>Marks v. United States</u>, 430 U.S. 188, 193 (1977) (explaining that "[w]hen a fragmented Court decides a case and no single

16

decision, the Supreme Court cited <u>Schlup</u> for this very proposition, stating that "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." <u>Calderon v. Thompson</u>, 523 U.S. 538, 559 (1998) (quoting <u>Schlup</u>, 513 U.S. at 324).[9]

<hr>

rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds."). However, Justice O'Connor joined the majority opinion, and her separate discussion of the actual innocence gateway test reflects agreement with that standard, not any desire to narrow the majority's construction of it. Nor did Justice O'Connor discuss any problems with the majority's reasoning in support of the test or note any distinction between newly presented and newly discovered evidence. Under these circumstances, the fairest reading of <u>Schlup</u> is that the test articulated by the majority opinion and its reference to evidence not presented (at least in the context of an ineffective assistance of counsel claim) was indeed supported by a majority of the justices, and therefore binding. Moreover, subsequently in <u>Calderon</u>, Justice O'Connor joined the majority opinion without writing separately, and the majority cited <u>Schlup</u> for the assertion that "a claim of actual innocence must be based on reliable evidence not presented at trial" in order to be credible. <u>Calderon v. Thompson</u>, 523 U.S. 538, 559 (1998).

[9] The <u>Calderon</u> dissenters also stated that "as the Court realizes, our standard dealing with innocence of an underlying offense requires no clear and convincing proof . . . and the Court would be satisfied with a demonstration of innocence by evidence not presented at trial, even if it had been discovered, let alone discoverable but unknown, that far back." 523 U.S.

Our Court has not yet resolved the meaning of new evidence in the actual innocence context. In dicta, we have suggested that new evidence generally must be newly discovered, while at the same time recognizing an exception may exist when a petitioner asserts ineffective assistance of counsel based on counsel's failure to discover the very exculpatory evidence on which the petitioner relies to demonstrate his actual innocence. See Houck, 625 F.3d at 94-95 (stating that the Court was "inclined to accept the [Eight Circuit's] Amrine definition of new evidence with the narrow limitation that if the evidence was not discovered for use at trial because trial counsel was ineffective, the evidence may be regarded as new provided that it is the very evidence that the petitioner claims demonstrates his innocence" but deciding to "stop short of applying a modified Amrine standard" and instead "assum[ing] without deciding" that the petitioner's evidence constituted new evidence). This limited exception avoids an inequity that could lead to the "injustice of incarcerating an innocent individual." McQuiggin, 569 U.S. at 393. Such an inequity could occur under the following circumstances: say that a petitioner was convicted of a murder, and the prosecutor had withheld a videotape depicting a different person committing the crime. Further assume the tape was not revealed until years after the trial. That petitioner could invoke the actual innocence gateway to pursue this Brady due process claim because the evidence was newly discovered. Now, assume the same videotape was produced to trial counsel and was available for use at trial, but counsel did not present it to the jury. Under Amrine, that petitioner would be forced to concede that the evidence was not new because it

---

at 573 (Souter, J., dissenting) (internal quotation marks and citations omitted).

18

was available at trial, and he would be foreclosed from seeking relief under the actual innocence gateway. In contrast, in the former scenario, the same evidence, which existed but was unknown to the petitioner, would be deemed new evidence that could support the actual innocence gateway.

As the Gomez court stated, "in a case where the underlying constitutional violation claimed is ineffective assistance of counsel premised on a failure to present [such] evidence, a requirement that the new evidence be unknown to the defense at the time of trial would operate as a roadblock to the actual innocence gateway." 350 F.3d at 679-80. To overcome this roadblock, we now hold that when a petitioner asserts ineffective assistance of counsel based on counsel's failure to discover or present to the fact-finder the very exculpatory evidence that demonstrates his actual innocence, such evidence constitutes new evidence for purposes of the Schlup actual innocence gateway.

The approach we adopt is consistent with Schlup and the rulings of many of our sister circuits. Moreover, it recognizes that "the injustice that results from the conviction of an innocent person has long been at the core of our criminal justice system." Schlup, 513 U.S. at 325. Indeed, "the conviction of an innocent person [is] perhaps the most grievous mistake our judicial system can commit," and thus, the contours of the actual innocence gateway must be determined with consideration for correcting "such an affront to liberty." Satterfield v. Dist. Att'y Phila., 872 F.3d 152, 154 (3d Cir. 2017). The limited approach we adopt to evaluate new evidence to support an actual innocence gateway claim, where that claim is made in pursuit of an underlying claim of ineffective assistance of counsel: (1) ensures that reliable,

19

compelling evidence of innocence will not be rejected on the basis that it should have been discovered or presented by counsel when the very constitutional violation asserted is that counsel failed to take appropriate actions with respect to that specific evidence; and (2) is consistent with the Supreme Court's command that a petitioner will pass through the actual innocence gateway only in rare and extraordinary cases. Schlup, 513 U.S. at 324.[10]

C

Here, the Magistrate Judge's report and recommendation and the District Court's decision adopting that report both understandably concluded that exculpatory evidence available to, but not presented by, Reeves's trial counsel—such as the evidence concerning alternative suspects—was not new evidence for purposes of the actual innocence gateway.[11] They therefore did not proceed to

---

[10] The Eighth Circuit's approach in Amrine and the Fifth Circuit's seemingly contrary approach in Floyd and Fratta are unpersuasive, as those courts provided no reasoning to support their narrower constructions of "new evidence."

[11] The Magistrate Judge relied on three Third Circuit opinions, Hubbard, Goldblum, and Sistrunk, as support for this conclusion that exculpatory evidence available to trial counsel but which counsel failed to present at trial did not constitute new evidence. However, "[t]he 'new' evidence Hubbard puts forth in alleging actual innocence is nothing more than a repackaging of the record as presented at trial." Hubbard v. Pinchak, 378 F.3d 333, 341 (3d Cir. 2004). As the Magistrate Judge acknowledged, we assumed for purposes of the appeal in Goldblum that the pathologist's report was new, reliable

20

determine the reliability of the evidence or consider whether such evidence, assessed with all the rest of the evidence adduced at trial, would more likely than not convince any reasonable juror not to convict Reeves. In light of their view that Reeves failed to satisfy the actual innocence gateway standard, they also did not reach the merits of Reeves's ineffective assistance of counsel claim. Because we hold that under the circumstances presented here, the Kai Anderson evidence is "new," given that it was known but not presented allegedly due to his counsel's ineffective assistance, we will vacate the District Court's order and remand. If on remand the District Court concludes that this new evidence is reliable, then it should proceed to undertake a holistic assessment of the new, reliable evidence and the evidence presented at trial to determine whether Reeves has shown it is more likely than not that no reasonable juror would have convicted him. If Reeves makes this showing, then the District Court should review his ineffective assistance of counsel claim on the merits under the applicable AEDPA standard of review.

III

For the reasons above, we will vacate the District Court's order and remand for further proceedings consistent with this opinion.

---

evidence, Goldblum, 510 F.3d at 226. Finally, Sistrunk did not characterize the petitioner's federal habeas claims as based on the alleged ineffective assistance of counsel who failed to discover or present to the fact-finder the exculpatory evidence demonstrating his actual innocence. See Sistrunk, 674 F.3d at 185-87.

21

McKEE, Circuit Judge, *Concurring*.

I agree with my colleagues' conclusion that evidence defense counsel was aware of, but failed to present, can satisfy the new evidence requirement of *Schlup v. Delo*.[1] However, I write separately to emphasize the weight of the evidence that supports Reeves's claim of actual innocence, and the questionable nature of the investigation that resulted in the conviction of someone who may well have languished in a prison cell for eight years for a murder that was most probably committed by someone else.

The circumstances leading to Reeves's conviction are summarized in my colleagues' thoughtful opinion along with much of the evidence that supports his claim of actual innocence. Indeed, the case in support of Reeves's claim of actual innocence is so substantial that a group consisting of retired federal judges, former federal prosecutors, and a former member of the Office of the Pennsylvania Attorney General's Office, has filed an amicus brief on his behalf.[2] Yet, as I shall discuss, for some inexplicable reason, police simply refused to follow even the most obvious leads that did not confirm their suspicion that Reeves was the killer. They did eventually obtain a confession from Reeves. However, given the totality of the circumstances here, that confession does not negate his claim of actual innocence.

**I.**

---

[1] 513 U.S. 298, 324 (1995).
[2] *See* Brief for Former Prosecutors, et al. as Amici Curiae Supporting Reeves 1.

1

Shortly after the May 25th, 2006 robbery of the City Gas & Diesel described in the majority opinion, Jerry Reeves, who was then just eighteen years old, was arrested at a city park in Harrisburg, Pennsylvania. He was not arrested because police suspected him of being involved in the fatal robbery of City Gas & Diesel. Rather, he was arrested for throwing a rock onto a miniature golf course and hitting someone in the leg. While in his jail cell, Reeves was approached by Officer Derek Fenton. Fenton did not approach Reeves based on any suspicion that Reeves was involved in the fatal shooting. Rather, Fenton fancied himself a bit of a sleuth and prided himself on his ability to ferret out information. He testified that he went to Reeves in his jail cell because he, Fenton, believed himself to have "an excellent rapport with our detective division for the intelligence [he was] able to gather."[3] In Fenton's words, he approached Reeves because: "You don't know until you try and anyone you encounter on the street, you just strike them a conversation."[4] Reeves, who had been adopted out of foster care, and had a history of lying, was eager to get out of jail and go home for a family cookout the next day. Thus, Fenton's instincts appeared to pay off.

Reeves told Officer Fenton that he had witnessed the robbery from across the street. He even identified the robber. Reeves told Fenton that the robber was a man named Jermaine Taylor, who was six feet tall with brown skin. Reeves would later testify at his trial that that was a lie. The police had apparently told Reeves that if he "had info they

---

[3] App. 307.
[4] *Id.* at 306.

would let [him] out," and Reeves wanted to be released so he could get home in time for the aforementioned cookout.[5]  He testified: "I ha[d] not seen my family in a while, so I wanted to see them." "That is why I lied."[6]  As promised, the police released him after the conversation with Officer Fenton and he attended his family's cookout.

In the meantime, a "very excited" Officer Fenton notified the detective bureau.[7]  Fenton told Detective Christopher Krokos, the lead detective on the City Gas & Diesel homicide, about Reeves's story.  Krokos understandably followed up by contacting Reeves who agreed to come to the police station to be interviewed on May 30th, five days after the robbery.  Once more, Reeves repeated that a six-foot-tall, brown-skinned, Black male named Jermaine Taylor had been the robber.  This time he added a detail that police knew was not true.  Even though the surveillance video depicted the shooter leaving the scene alone and on foot, Reeves stated that he had seen the robber run out of the store and get into a dark-colored Buick with lightly tinted windows and three other passengers.

Detective Krokos would later write in his daily report that Reeves's adoptive father, Terrie Reeves, had informed the detective that Reeves had admitted to lying about witnessing the robbery.  Krokos also noted in his report that

---

[5] *Id.* at 318.
[6] *Id.* at 318.
[7] *Id.* at 307-08.

Reeves's father had cautioned Reeves not to lie again to the police.[8]

Nevertheless, at this point, Krokos confronted Reeves about his untruthfulness. Reeves then revised his story and said that he had heard the shooting but had not actually seen it. To make things worse for Reeves, he admitted that Jermaine Taylor, the man he claimed had been the robber, "was someone he made up," and that "none of the information he gave [Krokos] was true." Reeves's admission that he had been lying clearly gave police reason to suspect that he might have been involved. As a result of that admission, Reeves was charged with hindering apprehension, and the investigation continued.

Police had already received a number of leads pointing in a different direction that should have, at the very least, cautioned against myopically focusing on Reeves. The very same day of the robbery, staff at the county work-release center in Harrisburg had informed police that two work-release clients—Kai Anderson and Michael Holmes—had escaped the night of the robbery. Anderson fit the description of the robbery suspect, and the work-release staff told police that it was "very coincidental" that Anderson and Holmes escaped the same night the robbery occurred. The work-release staff also provided police with photos and information about Anderson to aid in pursuing him.

---

[8] Officer Fenton, Detective Krokos and Terrie Reeves were not the only individuals to have witnessed Reeves lying. His foster care reports described him as "deliberately untruthful" as a child and "often untruthful . . . to avoid what would be minimal consequences."

Next, Kimberly Clark, the grandmother of Anderson's child, had independently called police to tell them that Anderson had been making minute-long calls to her daughter, Danielle Ignazzito, several times a day and had been "act[ing] mysterious[ly]."[9] Clark also reported that Anderson had told Ignazzito that "he's on the run and or is wanted."[10]

Then came a third tip about Anderson. Ignazzito, Clark's daughter and the mother of Anderson's son, had initially been "afraid" to give police information about Anderson's whereabouts.[11] But on May 29th, just four days after the robbery, Ignazzito told police that Anderson had called her several times to say that he had a lot of money to give her for their child. Ignazzito said she had also spoken to Kenneth Marlow, a friend of Anderson's. Marlow told her that Anderson was in trouble, that Anderson had fled to Ohio with Michael Holmes (who had escaped from the work-release center with Anderson), and that Anderson was being sought by police in connection with the City Gas & Diesel homicide.

Six days after the robbery, police arrested Anderson for escaping from the work-release center. Detective Krokos took the opportunity to interview Anderson, just as he had interviewed Reeves a few days earlier. The interview was unfruitful. Anderson confirmed that he had escaped from the work-release center but denied any involvement in the robbery. He did, however, confirm that he had asked Marlow

---

[9] App. 137.
[10] Id.
[11] Id.

5

to call Ignazzito, just as Ignazzito had told Krokos. Yet it is not clear if he also confirmed that he had expressed concern about being connected to the robbery, as Ignazzito had reported. Anderson did admit that he had been "in the area of Linden St[.] and Walnut St."—just a few blocks away from the City Gas & Diesel—on the night of the robbery.[12] He also said that he had encountered the real robber there and actually heard that person confess to the crime. Despite information placing him near the crime scene, and the three independent tips at least suggesting that further investigation into Anderson was warranted, it does not appear that suspicion ever turned from Reeves to Anderson (or to anyone else).

Then came a fourth tip. A week after interviewing Anderson, Detective Krokos interviewed Marlow. Marlow admitted calling Ignazzito on Anderson's behalf, as Ignazzito had reported, and to telling Ignazzito that Anderson was on the run. Marlow also said that Anderson was "involved in the robbery/homicide at the City Gas & Diesel on State St."[13] Marlow even told Krokos that he heard Anderson admit his involvement. According to Marlow, Anderson had said that he (Anderson) "got a gun[,] went to the gas station[,] and shot the dude and robbed him."[14]

Thus, Detective Krokos now had information implicating Anderson from not two, not three, but *four* sources—the work-release center staff, Clark, Ignazzito, and now Marlow. Yet, for reasons that are not at all clear on this

---

[12] *Id.* at 159.
[13] *Id.* at 165.
[14] *Id.* at 82.

6

record, the investigation continued to focus on Reeves. There is more.

Approximately a month after the robbery, another witness, Johnathan Johnston, came forward. Johnston and Anderson had known each other for over fifteen years and had reunited at Dauphin County Prison after Anderson's arrest for escaping from the work-release center. Johnston told Krokos that Anderson had admitted involvement in the City Gas & Diesel robbery while they were in the County Prison. Johnston's statement about Anderson's confession should have been taken particularly seriously because, unlike the stories that Reeves gave Krokos, Anderson's purported statements to Johnston included subtle details about the robbery, many of which were unknown to the public.[15]

---

[15] According to Johnston's statement, Anderson said he was "show[n]" the surveillance tape of the robbery during his interview with police. App. 93-94. The police report of Anderson's interview does not confirm that claim, nor does it suggest that any such viewing took place. However, the police reports indicate that police also showed the video to Xavier Henry, who had been identified as one of the City Gas & Diesel customers on the night of the robbery. Police did so in an attempt to identify Derrick Small, the only customer present in the City Gas & Diesel store when the robber entered. There is nothing in the record to establish any similar reason for showing the video to Anderson, who, as far as we know, had no information to identify Small or any other customer. Nor is it clear what portions of the video, if any, Anderson might have seen. The video is divided into multiple parts with footage from differing cameras both inside and outside of the store.

7

Specifically, Johnston said that Anderson had told him that (1) the shooter needed to be small enough to fit through the gap in the bullet-proof glass window to get to the other side of the counter; (2) the shooter was wearing all black; and (3) the shooter left the store on foot heading west. Johnston's statements to Krokos contained other indicia of reliability: Johnston knew that Anderson had admitted his involvement to Marlow, and that Marlow had repeated Johnston's inculpatory statement to Ignazzito.

Johnston told Krokos something else that the detective inexplicably ignored. According to Johnston, "[Anderson] knew he could beat [the evidence in the surveillance video] he just need somebody talk to [Ignazzito] so she can, don't say nothing and get scared because the cops already tried to scare her."[16] Indeed, Johnston said that Anderson had also asked him (Johnston) to have his wife threaten Ignazzito not to give the police any more information about Anderson and the City Gas & Diesel homicide. Finally, Johnston said that Anderson told him that after "the gun went off[,] the [clerk] fell then got back up and he fell again."[17] That detail was visible in surveillance videos of the crime, but had not been made public. Again, for reasons that are not at all apparent on this record, Krokos failed to pursue Anderson as a suspect, and the investigation began to "stall."[18]

---

[16] App. 94.

[17] *Id.* at 97.

[18] Krokos conducted an interview with Michael Holmes in March of 2007, some nine months after the crime, but Holmes admitted only that he and Anderson had left the work-release center before the homicide. Holmes denied having ever even been in the City Gas & Diesel.

Despite information that directly implicated Anderson and despite the police learning that Anderson knew subtle details about the robbery, the investigation appears to have simply gone dormant for three years. Then, serendipity unfortunately placed Reeves in Detective Krokos's crosshairs yet again. In July of 2009, Reeves, who was now twenty-one years old, had been arrested with his girlfriend after an incident at a bar. Upon learning of Reeves's arrest, and despite all of the evidence pointing toward Anderson, Krokos took the opportunity to speak with Reeves once more about the City Gas & Diesel robbery.[19] At his trial, Reeves testified that he agreed to be interviewed again because he wanted to keep his pregnant girlfriend—with whom he had been arrested—from going to prison and was told that the officers would "see what they could do" if he talked to them.[20]

Reeves offered the same story about having witnessed the crime that he had given Krokos three years earlier. However, this time Reeves said that two men, not one, had robbed the store and that Reeves's own cousin had stood outside as a lookout. Again, Krokos pressed Reeves on his lack of truthfulness. The video showed that only one man had robbed the store. Reeves responded by changing his story yet again. This time, he stated he was not actually across the street when he saw the shooting, but was in a parking lot near the payphone; that he spoke to his cousin about the imminent plan to rob the store; and that it was an unknown male who actually went inside. The questioning continued until Reeves finally asked, "[W]hat if I was in the

---

[20] App. 387-88.

store when it happened then what[']s that?"[21]   The police report states:

> Reeves was confronted with the fact that if other people are involved they may talk to us about the incident.  He was asked what [are Reeves's cousin and the other individual Reeves named] going to say if asked about this incident?  Reeves stated that they will say that it was me who did it.  Reeves then began to become concerned that he would not see his unborn child if he told us what occurred.  Reeves was further questioned.

Reeves then began to visibly shake and tremble.  He began to cry.[22]   Then Reeves "confessed."  He said that he robbed the store because he needed money; that he knew the people in the store because he used to sweep the floors for them; that he got a gun but that he did not know the make or caliber; and that he had been given the gun the same day by someone in Baltimore, Maryland.

Reeves then provided details on the robbery, many of which were prompted by leading questions from Krokos and his team.  They posed questions to confirm that, like the robber in the video, Reeves had also jumped over the counter:

Q.  . . .  Do you remember did you jump up or do anything in the store?

_____

[21] *Id.* at 198.
[22] Id.

10

A.  I think I jump behind the counter.[23]

They asked questions to corroborate the fact that bullet-proof plastic separated the robber from the clerk:

Q.  Okay what was separating customers from behind the register?

A.  Glass[.]

Q.  Was it glass or plastic or?

A.   Probably bullet proof plastic or something.[24]

They verified that Reeves's gun matched the gun used:

Q.   And describe the gun again what color was it?

A.  All black[.]

Q.   And it was a semi-automatic not a revolver.

A.  Semi-automatic yes.[25]

They asked Reeves to specify that he had acted alone:

Q.   And just, just so we're clear you were the only one involved in this there was nobody else involved in this incident?

A.  No not at all.[26]

---

[23] *Id.* at 106.
[24] Id.
[25] *Id.* at 108.
[26] App. 113.

11

And they repeatedly pressed Reeves on whether he had worn something to disguise his face, as the robber had done in the video:

> Q. Okay so what are you wearing when you go in the store?
>
> A. Black, black pants, black t-shirt.
>
> Q. Are you wearing a mask? Do you remember?
>
> A. No I don't remember if I had a mask on or not probably, probably did, no I didn't have a mask on.
>
> Q. You didn't have a mask on?
>
> A. No[.]
>
> A. Did you have gloves?
>
> Q. I think so, I think so probably.
>
> . . .
>
> Q. Q. Did [the store clerk] recognize you?
>
> A. Most likely yes. He seen me plenty of times before that so if I wasn't wearing a mask yes.
>
> Q. [S]o what you're saying is you don't remember whether or not you were wearing . . .
>
> A. [INAUDIBLE] masks or gloves that night.
>
> Q. Okay, those are the two things you don't remember whether or not you were wearing that night.

A. Yes[.]

Q. Just for the tape I'm not sure it got ah on there clearly, you don't remember if you were wearing a mask or gloves?

A. No[.]27

Despite obtaining what purported to be a confession, Krokos either ignored or did not credit some rather remarkable discrepancies between Reeves's account and the actual facts of the robbery. Reeves said that he struggled with the clerk before the shooting. Yet the surveillance video shows that the clerk and the robber never even touched one another.28 Reeves said he ran towards Boas Street, which is north of the City Gas & Diesel, while the actual robber headed in a westerly direction, according to the surveillance video. Reeves also said he did not remember if he had gotten anything from the store after firing the gun, though the real robber left with a bag full of money from the cash register. Finally, Reeves said the gun he used "looked like a []9" millimeter,29 which is the same caliber as a .357, but the actual gun used was a much smaller, .25 caliber.

Most significantly, in the video, the shooter appears to be right-handed. He removed the pistol from the front of his pants with his right hand then brandished it in his right hand.

---

27 *Id.* at 105, 112.

28 The clerk simply attempted to close the bullet-proof window separating the check-out counter from the customer area before the robber could point the gun through the window's opening.

29 *Id.* at 108.

13

He switched the gun to his left hand only after the clerk had been shot and he needed his right hand to finish taking money from the register and from the floor. Once he had collected the money, he used his right hand to jump back over the counter. It is uncontested that Reeves is left-handed, and he has offered affidavits from people who knew him as a child to corroborate that.[30]

Of course, police may not have noticed that Reeves was left-handed during the numerous times they interacted with him and it would have been understandable to simply assume, absent a reason to suspect otherwise, that he was right-handed. This is particularly true in light of his confession and his prior interviews, which continuously resulted in what can only be described as false exculpatory statements.

However, as I have already detailed, police had to ignore several leads to even get to the point of Reeves's confession three years after the fatal robbery. These leads included evidence that Anderson had admitted his involvement in the crime to two people; that he had suddenly come into a significant sum of money; that he had escaped from the work-release center on the night of the robbery; and that he had been in the vicinity of the robbery that night. Anderson had also tried to have someone threaten Ignazzito to keep her from saying anything more about his involvement in the robbery, and he had made statements revealing a detail

---

[30] Reeves offered testimony at trial that he was left-handed, but his trial counsel never offered evidence to corroborate that fact. Given his confession, the jury most likely simply discredited his uncorroborated testimony.

14

about the robbery not known to the general public. Yet, during the three-year lapse in this investigation, it does not appear that police did anything to pursue the evidence of Anderson's involvement before initiating the discussion with Reeves that ultimately led to the statement that resulted in his conviction for the fatal robbery. Given this record, as I noted at the outset, Reeves's apparent confession does not negate the claim of actual innocence based on newly discovered evidence under *Schlup v. Delo*.[31]

Reeves would not be the first person to have falsely confessed to a crime.[32] According to the National Registry of Exonerations, roughly half of individuals who have been exonerated following murder convictions involving DNA

---

[31] 513 U.S. at 324. I do not suggest that evidence of actual innocence must always be as strong as we have on this record before relief is available under *Schlup v. Delo.* Indeed, it can only be hoped that the kind of investigation that led to Reeves's confession, despite the strong evidence of someone else's guilt, will be exceedingly rare. Although the bar set by *Schlup* is a high one, it should not be raised so high that it becomes impossible to clear it. Nothing in *Schlup* leads me to conclude that the Court intended the interests of justice advanced by that case to be illusory in all but the most outrageous and extreme cases or that the accused must be able to prove actual innocence to a near mathematical certainty.

[32] During oral argument, counsel for Reeves was asked about the reported frequency of exonerations following false confessions. He subsequently submitted a reply pursuant to Fed. R. App. P. 28(j). *See* Appellant's May 28, 2018 Rule 28(j) Letter.

evidence in the United States since 1989, made a false confession.[33]  In Pennsylvania, the rate of false confessions is comparable.  Nearly half of individuals who have been exonerated with DNA evidence following a conviction for murder in Pennsylvania had confessed to those murders.[34]

---

[33] *Compare* Murder Exonerations in the U.S., The National Registry of Exonerations, http://www.law.umich.edu/special/exoneration/Pages/Exoner ations-in-the-United-States-Map.aspx (click "Murder" in "Crime" field; click "Present" button in the "DNA" field) *with* Murder Exonerations in U.S. with False Confessions, http://www.law.umich.edu/special/exoneration/Pages/Exoner ations-in-the-United-States-Map.aspx (click "Murder" in "Crime" field; click "Present" button in "False Confession" field; click "Present" button in the "DNA" field).  As of May 28, 2018, nationally, the Registry has recorded 195 individuals that were convicted of murder in cases involving DNA evidence and that have since been exonerated. Of those exonerees, 43 percent, or 84 individuals, gave false confessions.  These statistics were supplied by counsel in his May 28, 2018 Rule 28(j) letter.  *See supra* note 8; Appellant's May 28, 2018 Rule 28(j) Letter 1-2.

[34] *Compare* Murder Exonerations in Pennsylvania, The National Registry of Exonerations, http://www.law.umich.edu/special/exoneration/Pages/Exoner ations-in-the-United-States-Map.aspx (click "Pennsylvania" on interactive map; click "Murder" in "Crime" field) *with* Murder Exonerations in Pennsylvania with False Confessions, http://www.law.umich.edu/special/exoneration/Pages/Exoner ations-in-the-United-States-Map.aspx (click "Pennylvania" on interactive map; click "Murder" in "Crime" field; click "Present" button in "False Confession" field; click "Present"

In referring to this data, I do not, of course, suggest that police should have completely ignored Reeves's confession. Rather, I refer to it simply to underscore that Reeves's confession does not negate his arguments under *Schlup*. I have already noted that absent the detective's inexplicable failure to pursue leads pointing to Anderson and the equally puzzling three-year gap in this investigation, there would have been no incriminating statement from Reeves.

**II**.

Reeves has now spent eight years in prison for this armed robbery and murder conviction, a fact that will hopefully inform the speed with which subsequent courts address his now likely procedurally-cognizable habeas claim.

---

button in the "DNA" field). The Registry has recorded 9 individuals that were convicted of murder in Pennsylvania and have since been exonerated in cases that involved DNA evidence. Of those exonerees, 44 percent, or 4 individuals, gave false confessions.

As Brandon L. Garrett writes, there is a "new awareness among scholars, legislators, courts, prosecutors, police departments, and the public that innocent people falsely confess, often due to psychological pressure placed upon them during police interrogations." Garrett, *The Substance of False Confessions*, 62 Stan. L. Rev. 1051, 1052-53 (2010). Reeves's "trembl[ing]," tear-filled confession certainly bore the markings of such psychological distress. App. 198. He even attempted suicide in his cell just prior to having given the confession.